# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

PAMELA S. SELBY,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C06-3057-MWB

**REPORT AND RECOMMENDATION**

---

## I.  INTRODUCTION

The plaintiff Pamela S. Selby seeks judicial review of a decision by an administrative law judge ("ALJ") denying her applications for Title II disability insurance ("DI") and disabled widow's insurance benefits, and Title XVI supplemental security income ("SSI") benefits.  Selby claims the ALJ erred in failing to find her presumptively disabled under the regulatory Listings, rejecting her subjective complaints without proper analysis, posing an inaccurate hypothetical question to the vocational expert, failing to find her disabled under the medical-vocational guidelines or "grids," and failing to find her eligible for disabled widow's benefits.  (*See* Doc. No. 15)

## II.  PROCEDURAL AND FACTUAL BACKGROUND
### A.  Procedural Background

On September 4, 2003, Selby filed an application for DI benefits, alleging a disability onset date of August 25, 2003.  (R. 63-65).  Selby claimed she was disabled due to a back injury that resulted in two ruptured discs.  She stated her back condition prevented her from lifting much of anything.  (R. 84)  Selby concurrently filed an application for widow's insurance benefits.  (R. 319-21)  Selby's applications were denied

initially and on reconsideration. (*See* R. 47-49, 52-54) Selby requested a hearing, and her request for hearing was acknowledged by letter dated March 27, 2004. (R. 48-62) On October 20, 2004, Selby protectively filed an application for SSI benefits.[1] (R. 315-18) The court has been unable to locate a notice of decision relating to the SSI application other than the ALJ's post-hearing decision.

A hearing on all three of Selby's applications was held on August 2, 2005, before Administrative Law Judge ("ALJ") George Gaffaney. Selby was represented at the hearing by attorney Blake Parker. Selby testified at the hearing, and she offered the testimony of two witnesses: her sister-in-law, Charlene Kay Bergren; and Karen Terry, a coworker and also Selby's roommate. Vocational Expert ("VE") Carma Mitchell also testified. A supplemental hearing was held on October 11, 2005, for the purpose of completing the VE's testimony.[2] On April 5, 2006, the ALJ ruled Selby could return to her past relevant work as a nurse's aide, and therefore she was not disabled. (R. 13-22) Selby appealed the ALJ's ruling, and on June 16, 2006, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (R. 5-7)

Selby filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 5) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Selby filed a brief supporting her claim on March 16, 2007. (Doc. No. 15) The Commissioner filed a responsive brief on May 9, 2007. (Doc. No. 16) The

---

[1]Selby's application for SSI benefits cites an alleged disability onset date of April 21, 1991. (R. 316) This appears to be a scrivener's error that occurred when the Social Security Administration generated the typewritten form. (*See* R. 315, Leads/Protective Filling Worksheet dated October 20, 2004, listing an onset date of August 25, 2003.)

[2]The VE's testimony was not completed at the first hearing due to time constraints. *See* R. 362.

matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Selby's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Selby's hearing testimony

Preliminarily, the court notes that only a couple of minutes into the hearing, Selby asked permission to stand up for awhile, and she changed positions several times during the hearing. (*See* R. 328, 341-42)

Selby was born in 1952. She last worked in July 2003. Her husband died on July 18, 2003, and she stated her family decided to move her back to Iowa at that time. She moved back to Iowa in mid-August 2003.

Selby hurt her back on April 21, 1999, when she was working as a housekeeper at a nursing home in Wichita, Kansas. She was off work for six weeks, and when she returned to work, she had problems lifting, so she was moved to a resident assistant job. Initially, she assisted the administrator and nurses with charting, answering phones, bookwork, and clerical tasks. She was able to change positions from sitting to standing whenever she needed to. The job gradually began to involve more tasks that required increased stooping and bending, as well as lifting boxes weighing ten to twenty-five pounds. She was unable to tolerate the increased physical activity, and she left the job in January 2000. She did not return to work for a couple of years because she was uncertain what type of work she could do. She received Title 19 assistance and stayed home. (R. 329-33, 340)

In January 2002, Selby began working at New Hope, a residential facility for mentally retarded persons. At New Hope, she gave the residents their medications and helped them with personal care in the morning. She sometimes took residents shopping or to doctors' appointments. When the physical requirements of the job became too much

for Selby, her employer offered to move her to the night shift, when there would be less lifting required, but Selby had a minor daughter at home and was unable to work the night shift. She quit the New Hope job in July 2003, around the time of her husband's death. (R. 329-33, 336-40)

Prior to taking the job at New Hope, Selby and her husband had discussed the fact that the job might involve lifting. However, Selby felt she needed to take the job, and she was concerned about the type of job she could get. She stated the highest grade she completed in school was "either 10th or 11th," and she has had no further education of any kind since leaving school. She struggled in school and was a poor student. She continues to have problems managing her finances. In addition, she has problems with concentration due to her limited education and also due to pain medications she takes. (R. 334-36, 342)

At the time of the hearing, Selby was working part time at a daycare center, two or three days per week. The job required her to lift two gallons of milk at times, and she held one gallon in each hand for balance. She was not seeking other types of employment. (R. 341) Her roommate helped her pay living expenses. (R. 349) Selby received a worker's compensation settlement from her back injury, but she had exhausted those funds, although the insurance carrier continued to pay for Selby's medical bills related to the injury. (R. 350)

Selby stated that since her back injury in 1999, she has had ongoing, excruciating pain. She has seen a doctor at a pain clinic, where she underwent some type of laser procedure and had "trigger injections," but nothing has helped. According to Selby, her doctor has switched her pain medications several times due to side effects Selby would experience or ineffectiveness of the medication. (R. 344) She described her pain as a stabbing pain that begins in her buttocks and goes down her leg. She becomes "very fidgety" because she is unable to sit or stand for very long. She stated, "It's an excruciating pain all the time, but I've learned to live with it." (R. 344) Her medications

help some, and on "bad days," she also uses a TENS unit and "pain patches," as well as putting an ice pack around her leg. (R. 345-46) Selby also gets muscle spasms in the calf of her left leg during the night that wake her up. She stated her day-to-day pain level is "[b]etween seven and eight" on a ten-point scale, and at its worst, her pain is "eight to nine." (R. 345) When she takes medication for her pain, it usually takes an hour or so for the medication to give her any relief. (R. 345)

Selby estimated she can sit for only about five minutes at a time before she has to change positions. She stated that when she stands up, her hip sometimes "locks in" and causes her to cry. When she finally is able to stand up, it usually takes a couple of minutes before the pain subsides. She indicated she is "more comfortable standing than sitting." (R. 346)

Selby also described problems with "tendonitis and arthritis" in her hands. (*Id.*) She has pain and weakness in her wrists, and a "shooting pain" around her wrists. (*Id.*) She has told her doctors about these problems but she is not receiving any treatment. According to her, due to her arthritis, the problem would not resolve even with surgery. (R. 346-47)

Selby indicated her pain affects her ability to concentrate. She is unable to concentrate long enough to watch a television program or to read a book. Her medications make her tired, and if she sits still for very long, she will fall asleep and then not be able to sleep at night. (R. 347-49)

Selby and her roommate Karen sometimes go out to eat, but Selby otherwise has no social activities, although she has no difficulty getting along with people. (R. 349)

## 2. *Selby's witnesses' hearing testimony*

Selby's sister-in-law, Charlene Kay Bergren, has worked with Selby since Selby's return to Iowa after her husband's death. She has observed that Selby is unable to

comprehend almost all written materials, and Selby is unable to fill out forms by herself or do "anything connected with mathematics at all." (R. 353) Bergren completed all of the paperwork connected with Selby's applications for disability benefits. She stated Selby was unable to comprehend many of the questions even if Bergren read them to her. Bergren opined that Selby's inability to concentrate is due to her pain. However, Bergren also opined Selby could manage her own benefits "[w]ith supervision." (R. 354)

Karen Terry, Selby's coworker and roommate, stated she provides financial assistance to Selby. Selby helps buy groceries with her food stamps. Terry indicated Selby is unable to do any lifting or vacuuming due to her back pain, so Terry does those tasks. She stated she has observed Selby attempt to do similar tasks and Selby appears to be in pain. In addition, Terry stated she and Selby's other coworkers make accommodations for Selby at work. They lift children in and out of highchairs, and fill in so Selby can take frequent breaks during the day. Terry stated Selby changes children's diapers on the floor because she is unable to lift the children onto a changing table. (R. 355-56)

### 3.    *Selby's medical history*

Selby had an MRI of her lumbar spine on November 21, 2002, to evaluate her complaints of left leg pain. The MRI showed "[d]egenerative disc changes rather advanced L4-5 with broad based disc bulge, which is somewhat  more eccentric to the left." (R. 154) On December 2, 2002, Selby saw Philip R. Mills, M.D. to review her MRI results. Selby complained of "deep pain at night and numbness in the left lower extremity." (R. 163) Dr. Mills noted no muscle spasm; lumbar lordosis; pain in the left leg on straight-leg-raising, but no pain on the right; and "pain in the back on the left and to a lesser extent on the right" upon foraminal encroachment testing. (*Id*.) He planned

to order an EMG to check for electroneurodiagnostic changes, and he referred Selby for an epidural injection.

Selby saw Jon C. Parks, M.D. at a pain clinic on December 5, 2002, and received a lumbar epidural steroid injection. She "had very gratifying results for approximately one week." (R. 152) She returned to the pain clinic on January 21, 2003, and reported that she had been shopping and sat on a bench that collapsed under her, significantly exacerbating her lower lumbar and left lower extremity discomfort. Dr. Parks noted Selby had a "[h]istory of chronic myofascial pain syndrome of the lumbar spine." (*Id.*) He also noted Selby was very tearful and distressed due to "significant outside stressors," arising from difficulties with a schizophrenic son. (*Id.*) The doctor administered another lumbar epidural steroid injection, with follow-up scheduled in six to seven weeks. He assessed Selby with "L4-5 disc desiccation and disc bulge, particularly left lower extremity, L4-5 and L5-S1 radicular-type symptoms"; "L5-S1 disc bulge centrally"; and "[h]istory of chronic myofascial pain syndrome of the lumbar spine, stable." (*Id.*)

Selby returned for follow-up on April 8, 2003, and saw Rita Simpson, RPA-C. Selby reported that her radicular pain had improved since her January 21, 2003, injection. She reported some continuing low back pain "that exacerbated last week after pushing wheelchairs out at the zoo while on an outing." (R. 151) She had been unable to bend over and put on her socks for a couple of days, but this had improved. She was not taking any of her prescribed muscle relaxants, and tried not to take Darvocet unless she had to. On examination, P.A. Simpson noted no significant swelling, and no increased pain with flexion or extension. Straight-leg-raising was negative. P.A. Simpson refilled Selby's prescription for Lidoderm patches, up to three daily; restarted Selby on Skelaxin 400 mg., one or two tablets up to four times daily for spasm; and Darvocet as needed. She recommended Selby "avoid any lifting, excessive bending or twisting or pushing heavy objects at this time." (*Id.*)

Selby saw Dr. Parks again on July 10, 2003. She stated her low back pain had returned and she requested another trigger point injection. The doctor was unable to administer the injection that day because he had to await approval from Selby's worker's comp carrier. He started Selby on Baclofen 10 mg. twice daily and Lortab 5 mg. to see if that combination would work better than the Darvocet. (R. 149-50)

Selby returned to see Dr. Mills on July 15, 2003. She indicated she was doing "reasonably well" with injections about every three months. She noted Dr. Parks had prescribed Baclofen and Lortab, which were giving her a headache and an upset stomach, and she stated the Lortab did not help her pain as much as the Darvocet. Dr. Mills made no changes to Selby's medications. (R. 162)

On August 18, 2003, Ruth M. Sherman, D.O. wrote Selby a work restriction that stated, "Due to medical reasons only able to work 1/2 days until 9-18-03." (R. 155)

On August 19, 2003, Dr. Mills imposed permanent work restrictions on Selby as follows: no bending or stooping, no lifting or carrying over thirty-five pounds, and "lift with proper body mechanics." (R. 157-58) Selby saw Dr. Mills on September 23, 2003, for follow-up. She reported that her husband had died suddenly about a month earlier. Selby had stopped working at that time and had not returned to work. She planned to move back to her home town in Iowa. The doctor noted the following:

> Despite the fact that [Selby] is not working, her back pain has continued without any real significant improvement. She notes pain in the belt line and in the hips and in the medial left groin with stabbing type discomfort. She has not had any injections for a couple of months and apparently since she is moving there is no time to get this in. Her last MRI was 11/21/02 and revealed advanced L4-5 broadbased disc bulge eccentric to the left.

> She found on her last job that transfer activities were difficult[], particularly when the patient would unexpectedly stop assisting. She tried to be quite careful with her back.

On physical examination, Dr. Mills noted no muscle spasm in the thoracic or LS spine; "tenderness along the iliac crest and along the greater trochanters bilaterally"; and "tenderness to palpation in the right groin region." (*Id.*) Selby had increased discomfort on forward flexion, and eased discomfort on extension. The doctor's assessment was "[c]entral discopathy at L5-6"; "[l]ow back sprain"; and "[b]ilateral trochanteric bursitis." (*Id.*) He noted Selby felt her back problem was worsening gradually, with new symptoms of pain in her hips on both sides. She continued to take Darvocet as needed, but stated it only eased the pain somewhat. He indicated her records would be transferred when Selby found a new provider after her move. (*Id.*)

Selby saw Michael W. Stitt, M.D. in Fort Dodge, Iowa, on November 18, 2003, for follow-up of her ongoing back pain. She described the history of her injury and subsequent treatment, and noted doctors had told her that her back problem could not be helped by surgery. Selby complained of left leg numbness and tingling from the mid-calf up to her hip. The doctor did very little examination, expressing a desire to obtain Selby's records and, in particular, her previous MRI to determine whether Selby had a ruptured disk. He referred her for physical therapy to improve the ranges of motion of her hips. (R. 165)

Selby had three sessions of physical therapy during November 2003. She did not notice any improvement, and reported a significant increase in her low back pain the day following each therapy session. In addition, she found the forty-five minute drive from her home to the therapist's office to be very difficult. Selby was "strongly encouraged" to find a physical therapy clinic closer to home and continue with her treatments. She was advised that her chronic pain would not diminish with only a few treatments. (R. 166; *see* R. 167-75)

On December 15, 2003, Dan L. Rogers, Ph.D. performed a mental status examination interview of Selby and reviewed her records, at the request of Disability Determination Services. (R. 178-80) Among other things, Dr. Rogers noted Selby "was in obvious pain but did not appear to be dramatic in her reactions to pain, but instead seemed to be suppressing her discomfort." (R. 179) He noted Selby had good attention and concentration, and she had good retention of both recent and remote information. He found Selby to be depressed, but he opined this was due to the loss of her husband, problems with two of her children, reduction in social activities since she had quit work, and chronic pain. He opined she "does not appear to suffer from major depression." (R. 180) With regard to Selby's mental functional abilities, Dr. Rogers found the following:

> [Selby] is able to understand and remember locations, directions, and procedures. Her attention and concentration are good for relatively brief periods; however, her depression will probably cause them to wane after extended efforts. Her pace is below average and it is made worse by the pain she suffers. She is able to interact appropriately with supervisors, coworkers, and the public; but again, the depression might reduce this ability at times. [Selby] is able to adjust to changes in the work place in terms of her psychological functioning.
>
> She is able to handle cash benefits.

(*Id.*

On February 1, 2004, Dee Wright, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (R. 181-94), and a Mental Residual Functional Capacity Assessment form (R. 195-98) regarding Selby. Dr. Wright found no mention in Selby's records regarding psychiatric complaints. She noted that although Selby alleged she has difficulties with concentration and retention, "she indicates she is taking eight different medications and has no difficulties remembering when to take them." (R. 199) Dr. Wright concluded Selby has moderate cognitive restrictions of function, but she

nevertheless "is able to perform a range of cognitive activity from simple to moderately complex without significant limitations of function." (*Id.*) She found that although Selby has a medically-determinable mental impairment consisting of "an adjustment reaction with depressed mood," Selby has no severe mental functional limitations with either her social interaction or her activities of daily living. (*Id.*)

On October 7, 2003, a medical doctor reviewed the record on behalf of Disability Determination Services and completed a Physical Residual Functional Capacity Assessment form. (R. 201-08) The doctor opined Selby would be able to lift up to twenty pounds occasionally and ten pounds frequently; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; push/pull without limitation; and perform all types of postural activities occasionally. (*Id.*) The doctor found Selby's "wide-range of daily activities" to be inconsistent with her subjective allegations, noting Selby cares for her personal needs, cooks, does the laundry, does household chores, shops for groceries, drives, and can leave her house, all without assistance. (R. 206) On October 7, 2003, Claude H. Koons, M.D. reviewed the file and concurred with the DDS physician's evaluation. (R. 208)

On January 15, 2004, Selby saw Marco C. Araujo, M.D. for a pain management consultation, on referral from Dr. Stitt. (R. 274-84) Selby reviewed the history of her April 1999 injury and subsequent treatment. She reported the following current symptoms:

> The patient describes her symptoms as aching and numbing sensation in her lower back. She states that 75% of her pain is localized in her back with 25% of her pain in the lower extremities. The patient states that the pain radiates down her hips, left greater than right, with numbness below her left calf down to the lateral aspect of her left foot. She states that her pain is relieved partially by lidocaine patches, TENS unit, ice, massage and pain medications. The patient states that walking, lifting and especially sitting for any period of time aggravates her symptoms. The patient also complains of some spasms n her calf and foot. The patient states that the pain is constant

11

and she has just lived with it since her accident. She states that her current medication provides 75% relief of her symptoms. She also underwent trigger point injection to her back which provided up to 90% relief of her symptoms. As mentioned, prior epidurals provided just 60% of relief. . . . The patient denies any sphincter abnormalities or leg weakness. The patient states that she has some difficulty standing up from a sitting position. She also states that most of her limitations regarding life activities are walking abilities, normal work routine, sleep, and enjoyment of life

(R. 274)

Selby's current medications were Propoxyphene/APAP 100/650, one to two tablets every six hours as needed for pain; Bextra once daily; Tagamet twice daily; and a Lidocaine patch for her back. (R. 275) She elected to try conservative management with pain medications, and Dr. Araujo refilled her current medications. In addition, the doctor started Selby on Baclofen, "[d]ue to the major degree of muscle spasms in her back and some signs of lumbar radiculopathy[.]" (R. 276) The doctor noted that nerve root blocks had not been tried yet for Selby's pain, and he indicated that would be considered in the future. He advised Selby that she would need follow-up visits due to the nature of her problems, and he expressed doubt that she had reached maximum medical improvement. (R. 276-77)

Selby returned to see Dr. Araujo on February 11, 2004. (R. 268-73) She stated the Baclofen helped her back spasms, but it made her nauseous and tachycardic. She apparently had been seen in the ER for the tachycardia, accompanied by chest pain and pressure, and she quit taking the Baclofen following that incident. She was scheduled for a cardiac workup. (R. 268)

Selby stated she was using her TENS unit two or three times per month and this, together with the Lidocaine patches, provided good relief of her pain. She complained of some pain over her left hip and the doctor noted some swelling in Selby's right hand. Dr.

Araujo instructed Selby to use her TENS unit more frequently, two or three times per week.  He also prescribed Darvocet for pain.  He noted the following regarding Selby's left hip pain:

> I instructed the patient to start her Bextra as she has signs and symptoms consistent with left hip/trochanteric bursitis.  It is unclear and difficult for me to ascertain that her left greater trochanteric bursitis may be related to her accident, but there is a possibility as she has been in antalgic gait leaning towards the left which could produce bursitis over the greater trochanter.  I told the patient to continue the Bextra which may provide relief of her left hip discomfort.  I have also told the patient to sleep on her right hip to prevent aggravation of the left greater trochanteric bursitis.

(R. 269)  The doctor directed Selby to return for follow-up in three months.  (*Id.*)

Selby saw Dr. Araujo again on May 17, 2004.  (R. 261-67)  She reported that sleeping on her right side and taking the Bextra had improved her symptoms on the left side, but she now was having symptoms on the right side, with pain in her right hip, buttock, and thigh.  The doctor noted Selby looked fatigued.  (R. 261)  He found her symptoms to be "very consistent with right-sided trochanteric bursitis and right-sided facet arthropathy," and he opined her symptoms also might be caused by her antalgic gait.  He recommended a steroid injection, and he prescribed physical therapy to try to correct Selby's posture and her antalgic gait.  He decreased her Bextra dosage, noting it could be causing fluid retention.  (R. 262)  Dr. Araujo administered a right trochanteric bursal injection.  (R. 267)

Selby saw Dr. Araujo for follow-up on June 10, 2004.  (R. 256-60)  She stated the injection had improved some of her right-side symptoms.  She also stated she had improved about 50% with the physical therapy.  Currently, her primary symptoms were localized in her left calf, which was painful and produced spasms during the night.  She was taking an average of six Darvocet-N 100 and six Extra-Strength Tylenol daily, and

using a Lidocaine patch daily. Notes indicate she had discontinued the Bextra due to fluid retention and elevated blood pressure. (R. 256) The doctor noted Selby's range of motion was improved in her cervical and lumbosacral spine. He recommended Baclofen for the calf spasms, but Selby was unwilling to take Baclofen due to side effects she had experienced in the past. The doctor also recommended Amitriptyline in the evening. He directed Selby to discontinue the Darvocet-N to prevent Selby from taking too much acetaminophen, which could cause liver problems. Selby elected to postpone another right-sided facet injection, continue with physical therapy at home, and follow up in four months or as needed. (R. 257)

Selby returned to see Dr. Araujo on August 5, 2004. (R. 251-55) She continued to report right-sided hip discomfort which the doctor indicated was suggestive of right-sided facet arthritis. She also complained of numbness and paresthesia over her left leg. She was using a Lidocaine patch daily, but stated the patch only worked superficially. The doctor noted Selby had decreased range of motion of her lumbosacral spine, "major limitation to extension of the lumbosacral spine," and slight tenderness on palpation of the right-sided trochanteric bursa. Dr. Araujo prescribed Oxycodone for pain. He planned to do a right-sided facet joint injection, and he also planned to "do a diagnostic therapeutic block using lidocaine 2% and Kenalog," with possible radiofrequency lesioning of the medial branch nerves on the right if indicated by Selby's response to the nerve block. (R. 252)

Dr. Araujo performed the nerve block at L3-4, L4-5, L5-S1, and L2-3, on September 1, 2004. (R. 239; *see* R. 240-50) Selby tolerated the procedure well and was directed to follow up with the doctor "for radiofrequency lesioning of the right-sided medial branch nerves at her earliest convenience." (R. 239) Selby saw the doctor on September 15, 2004, and reported that she had experienced about 75% pain relief for about four hours following the nerve block. The doctor noted this was consistent with his

expectations from the diagnostic procedure. He opined Selby should obtain more long-term pain relief of at least six months' duration from the radiofrequency lesioning. He planned to schedule the procedure, and directed Selby to continue taking Darvocet-N 100, Amitriptyline, and Tylenol. He also prescribed Dilaudid 1 mg. every six hours as needed for pain relief. (R. 233-34)

On October 14, 2004, Selby underwent right-sided lumbar facet/medial branch nerve radiofrequency lesioning at L2-3, L3-4, L4-5, L5-S1, and S1-S2. (R. 221-32) The doctor had added the S1-S2 level to the radiofrequency lesioning to denervate the L5-S1 level. (R. 221-22; *see* R. 223-32) Selby saw the doctor for follow-up on November 16, 2004. (R. 216-20) She reported "great improvement in her back discomfort" since the nerve block procedure, but she continued to complain of right hip pain, aggravated by walking and by putting on her socks. The doctor prescribed Bextra for four weeks. If that did not improve Selby's symptoms, then he planned to administer a right trochanteric bursa injection, and later, a right sacroiliac joint injection. He continued Selby on Darvocet-N, Amitriptyline, and Neurontin. (R. 216-17)

Selby saw Dr. Araujo again on December 22, 2004. She reported improved back and hip pain, rating her pain at 2/10. She was only taking Darvocet occasionally and had discontinued the Amitriptyline. Palpation of Selby's right hip and low back did not reproduce any symptoms. She was directed to continue using the Lidocaine patch, take Darvocet and Amitriptyline as needed, and reduce her Neurontin dosage to 300 mg. twice daily. In addition, because Selby had fallen and injured her knee recently, the doctor continued her on the Bextra for three more weeks. (R. 211-12)

Selby returned to see Dr. Araujo on March 25, 2005. (R. 295-99) She again was experiencing right-sided hip and thigh discomfort, increased since she had stopped taking Bextra. She also was experiencing "some pops in her legs and occasional numbness down to her toes." (R. 295) Notes indicate Selby had been more active, babysitting "and also

taking some classes." (*Id.*) She exhibited some difficulty standing up. The doctor diagnosed Selby with right trochanteric bursitis, and restarted her on Bextra. She continued to take Neurontin and Amitriptyline. He also directed her not to sleep on her right side. (R. 295-96)

On July 18, 2005, Selby saw physical therapist Daryl Short for a physical functional capacity assessment. (R. 300-01) He noted Selby ambulated "with an antalgic limp on the right lower extremity." (R. 300) Her ranges of motion were limited to 50% backward bending, 75% bending to the left, 50% bending to the right, and 50% rotation right and left, with increased pain on all movement. She performed some functional carrying during the exam but her lifting was restricted due to increasing pain. The physical therapist noted that from his observation, Selby's symptoms were "often to frequent," and he recommended she limit her lifting to five to ten pounds occasionally. (R. 300-01)

On July 29, 2005, at the request of Selby's attorney, Michael W. Stitt, M.D. completed a Physical Residual Functional Capacity Questionnaire regarding Selby. (R. 306-09) Although it is not entirely clear from the form, it appears Dr. Stitt examined Selby and administered some type of functional testing. Questions on the form inquire about a "patient's performance during testing." *See, e.g.*, R. 306. Dr. Stitt indicated Selby complained of right buttock and thigh pain, and she alternately stood up and sat down about every five minutes. He noted that "pain seemed to be a much more important factor than fatigue" for Selby. (R. 306) He noted that depression, anxiety, and other psychological factors impacted Selby's test results. (*Id.*) He further noted that Selby's pain frequently interfered with her attention and concentration. (*Id.*)

Dr. Stitt opined Selby would have the following functional limitations if she were placed in a competitive work situation: (1) walking of no more than half a block, and sometimes only five to six steps; (2) sitting for five to ten minutes at a time before having to stand; (3) standing for no more than fifteen minutes at a time before having to sit down

or walk around (noting Selby "tends to shift from one leg to another"); (4) sit and stand/walk for a total of no more than two hours during an eight-hour day, with normal breaks. (R. 307) He indicated Selby would have to walk around for three or four minutes at five-minute intervals throughout the workday, and she would require a job that permitted her to shift positions at will from sitting, standing, or walking. (*Id.*) The doctor indicated Selby currently was working two-hour days, and she had to take unscheduled two-minute breaks every fifteen minutes. He opined Selby should lift no more than ten pounds occasionally, and she should never lift more than ten pounds. He opined Selby should never twist or climb ladders, and only rarely should stoop/bend, crouch, or climb stairs. (R. 308) He further opined Selby should use her hands/fingers/arms for repetitive reaching, handling, or fingering, for no more than 8% of the time, total, during a normal workday. (R. 309)

Dr. Stitt indicated Selby's impairments would not produce "good" and "bad" days because her days were "all bad." (*Id.*) He estimated she likely would be absent from work about one-third of the time, noting she missed about one day in three even when she was only working two hours per day, three days per week. (*Id.*)[3]

On August 11, 2005, Selby saw Mohammed K. Youssef, M.D., another physician in the pain clinic where Selby had been seeing Dr. Araujo. (R. 310-13) Selby complained of low back pain, radiating into her right lower extremity, and she rated her pain at a level of 8/10, with an average pain level of 6/10 recently. She indicated her pain was accompanied by tingling and numbness in her right lower extremity with weakness in her right foot. She stated her pain increased with walking, bending forward, or sitting for a

---

[3]The only records the court has located relating to Dr. Stitt's treatment of Selby are from November 2003, some eighteen months before the doctor completed this questionnaire. *See* R. 165; *see also* R. 274. Although the Physical RFC Questionnaire completed by Dr. Stitt requests that "all relevant test results" be attached, no records are attached to the form. In the absence of any context for the basis of his opinions, Dr. Stitt's RFC determination is of little or no value.

long time. Pain medications provided some relief. Selby stated the radiofrequency lesioning had relieved her pain about 50% for about two months. (R. 310)

The doctor noted Selby continued to have an antalgic gait. She exhibited "limited range of motion, tenderness on palpation of the facet joints on the right side with negative straight leg raising test and some weakness on dorsiflexion on the right side." (R. 311) Selby was not interested in any injections or other procedures at this time. The doctor increased Selby's dosage of Vicodin to one tablet twice daily as needed. (*Id.*)

### 4.  *Vocational expert's testimony*

The ALJ asked the VE to consider someone of Selby's age, education, and work history, with he following limitations:

> My first hypothetical . . . would limit lifting to 20 pounds with 10 pounds being lifted frequently, stand and sit for six hours each in an eight hour workday. With regard to the non-exertional physical limits, no ladder climbing and the rest would be occasional only, we're talking about stair climbing, balance, stoop, kneel, crouch and crawl. Able to do more than simple routine constant tasks but not complex and just occasional production rate based which I define as strict quotas of time frames. If we assume the claimant of this residual functional capacity could past relevant work be done either as she did it or as it is typically done in the national economy?

(R. 364) The VE replied that the hypothetical claimant would be able to work as a nurse's aide, as Selby performed the job, which was as an unskilled job with no physical lifting. The VE stated the hypothetical claimant also could work as a residential aide, as Selby had performed the job, which also was at an unskilled level. (*Id.*)

The ALJ next asked the VE to consider the same individual, but with lifting limited to ten pounds occasionally and five pounds frequently, and the ability to stand for a total of six hours, sit for fifteen minutes at a time for a total of four hours, and perform only simple, routine, constant tasks with "just occasional production rate pace as before." (R.

364-65) The VE indicated this individual would not be able to return to any of Selby's past work. The VE noted a lifting limitation of five to ten pounds resembles a sedentary work level; however, the ability to sit for only fifteen minutes at a time for a total of four hours a day would preclude strictly sedentary work on a full-time basis. (R. 365) In addition, the restricted production level, combined with the lifting restriction and the limitation on sitting time, would preclude not only Selby's past work, but any competitive work. (*Id.*)

Selby's attorney asked the VE the following hypothetical question:

> Considering a person who is closely approaching advanced age with an eleventh grade education, past relevant work as described in [the VE's past relevant work summary, *see* R. 142], the ability to sit for only 5 to 10 minutes at a time, stand for 15 minutes at a time, with a sit/stand limitation in an eight hour workday of only two hours with an intermittent need to walk during those periods of time, but the ability to walk for only three to four minutes, unscheduled breaks of every 15 minutes for two minutes at a time, occasional lifting of ten pounds and the ability to carry ten pounds only occasional[ly], no twisting or climbing ladders, rarely stooping, crouching or climbing stairs and reaching, handling or fingering limited to 8 percent of the time. Would she be able to do her past relevant work?

(R. 366) The VE stated this hypothetical individual would not be able to do any of Selby's past relevant work, and would be unable to do any other work that is available in the national economy. (*Id.*)

The ALJ then asked a third hypothetical question, as follows:

> Well, I'm then going to add my third hypothetical would limit the lifting to ten pounds and five pounds, and stand and sit six hours each in an eight hour workday and have a sit/stand option at will. So, could then could move back and forth with the rest staying as I had in my first hypothetical -- no in my, well, the non-exertional again no ladder climbing, the rest just occasional simple routine constant tasks and just

> occasional production rate paced. Now with this change,
> would there be any work that our hypothetical individual could
> perform?

(R. 366-67) The ALJ clarified that the individual would be able to sit or stand at will, or alternatively would be able to change position for a couple of minutes and then return, at the individual's discretion. The ALJ expressly did not limit the length of time the individual would have to sit or stand, but maintained that the individual would "have to be able to stand or sit anytime they want to be able to." (R. 367) The VE indicated this hypothetical individual would be unable to perform any type of competitive work. (*Id.*)

### 5. *The ALJ's opinion*

The ALJ found Selby has not engaged in substantial gainful activity since her alleged disability onset date. (R. 16) He found Selby to have a "severe combination of impairments" consisting of "degenerative disc disease of the lumbar spine with chronic myofascial pain syndrome, trochanteric bursitis, sacroiliitis, facet arthritis; adjustment disorder with depressed mood and hypertension[.]" (Citations omitted.) He found that in combination, Selby's impairments "could reasonably be expected to cause work-related functional limitations." (*Id.*) From a mental standpoint, the ALJ found Selby to have "mild restriction of daily activities, moderate difficulties maintaining concentration, persistence and pace; mild restriction of social functioning and no periods of decompensation." (*Id.*) However, he further found Selby's combination of mental and physical impairments did not meet the Listing level. (*Id.*)

The ALJ assessed Selby's residual functional capacity as follows:

> After careful consideration of the entire record, the
> undersigned finds that the claimant has the residual functional
> capacity to work performing more than simple, constant tasks
> but not complex tasks with occasional production pace defined
> as strict quotas or timeframes; lifting 20 pounds occasionally
> and 10 pounds frequently; standing and/or sitting for a total of

20

> 6 hours in an 8-hour workday and performing postural
> maneuvers including balancing, stooping, kneeling, crouching,
> crawling and climbing stairs only occasionally but never
> climbing ladders.

(R. 19) In making this assessment, the ALJ "accorded weight to the opinion of Dr. Parks which is consistent with the functional abilities assessed by Daryl Short upon physical examination."[4] (*Id.*) The ALJ found that although the State agency consultants had reviewed the record adequately, "given the chronic nature of the claimant's pain, [it is] reasonable to set forth a more restrictive residual functional capacity for unskilled work." (*Id.*)

The ALJ found Selby's subjective complaints regarding the degree of limitations caused by her impairments not to be entirely credible. He was "not . . . persuaded that treatment modalities have been ineffective when considering the record as a whole," noting Selby had declined further treatment after receiving "significant relief from injection therapy." (R. 21) The ALJ gave little or no weight to the testimony of Selby's witnesses, noting the witnesses were not "disinterested third parties . . . whose testimony would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges." (*Id.*) He further did not give the witnesses' testimony significant weight because the witnesses were not medically trained, and he found their testimony to be inconsistent with the preponderance of the medical evidence of record. (*Id.*)

---

[4]The court has been unable to locate in the record any opinion by Dr. Parks relating to Selby's functional abilities.

The ALJ relied on the VE's response to his first hypothetical question in finding Selby can return to her past relevant work as a nurse's aide, as Selby had performed that work.  (*Id.*)[5]

Because the ALJ found Selby can return to her past relevant work, he found that she is not disabled, nor had she been disabled at any time through the date of his opinion.  (R. 22)

## III.  DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A.  Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.  20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605

---

[5]The ALJ then noted, "Accordingly, the claimant is *unable* to perform past relevant work." (R. 21, emphasis added)  This obviously was a typographical error given the remainder of the ALJ's discussion in this section.  *See id.*

(8th Cir. 2003. First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving

Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

### B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive. . . .").  Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page*  484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion."  Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Krogmeier*, 294 F.3d at 1022.  The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial."  *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence.  *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)).  The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*."  *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)).  Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision."  *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221

F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1)   the claimant's daily activities;
2)   the duration, frequency and intensity of the pain;
3)   precipitating and aggravating factors;
4)   dosage, effectiveness and side effects of
     medication;
5)   functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984).  *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002).  The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## *IV. DISCUSSION*

Selby argues the ALJ erred in failing to find that her disorder of the spine meets the requirements of Listing § 1.04(A) for a presumptive impairment.  (*See* Doc. No. 15 at 11-12)  The Listing requires a spinal disorder resulting in nerve root or spinal cord compression as evidenced by several criteria.  The Commissioner concedes that evidence in the record "could be read to demonstrate nerve root compression."  (R. 16 at 12)  However, the Commissioner argues the record does not demonstrate that Selby meets the other requirements of the Listing.  (*Id.*)  The Commissioner is correct.  Among other things, the Listing requires positive straight-leg-raising tests for a presumptive disability due to lower back impairment.  Selby consistently had negative straight-leg-raising bilaterally.  (*See* R. 151, 162, 262, 269, 276, 311)

Selby further argues she "should be found disabled under the Grids at 20 C.F.R. Part 404, Sub-Part P, Appendix 2, Section 201.09." (Doc. No. 15 at 19)  She argues she is unable to return to her past relevant work, relying on the functional assessments made by Dr. Stitt and physical therapist Daryl Short.  The Commissioner claims Selby's argument "relies on an RFC based on rote acceptance of all of [her] subjective allegations and the unsupported opinion of Dr. Stitt." (Doc. No. 16 at 21)  He also argues Selby's

contention "usurps the ALJ's position as fact-finder." (*Id.*, citing *Benskin v. Bowen*, 830 F.2d 878, 885 n.2 (8th Cir. 1987)).

> [T]he medical-vocational guidelines or 'grids,' . . . are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. *See Foreman v. Callahan*, 122 F.3d 24, 25 (8th Cir. 1997). Reliance on the grids is "'predicated on an individual's having an impairment which manifests itself by limitations in meeting the strength requirements of jobs' and therefore 'may not be fully applicable where the nature of an individual's impairment does not result in such limitations,'" namely, mental impairments and pain. *Id.* (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)). Thus, if a claimant's ability to perform the full range of work in a particular category is limited by a nonexertional impairment, the ALJ cannot rely exclusively on the grids to determine disability but must consider vocational expert testimony. *See Frankl*, 47 F.3d at 937.
>
> Pain is a nonexertional impairment. *See Cline [v. Sullivan]*, 939 F.2d [560,] 565 [(8th Cir. 1991)].

*Beckley v. Apfel*, 152 F.3d 1056, 1069 (8th Cir. 1998). *See Banks v. Massanari*, 258 F.3d 820, 827 (8th Cir. 2001) (when a claimant has nonexertional impairments, use of the "grids" is inappropriate) (citing *Beckley*).

The lion's share of Selby's subjective complaints arises from her claims of ongoing pain that interferes with her ability to function. Thus, Selby cannot be "found disabled under the Grids," as she argues. Vocational expert testimony must be considered by the ALJ in determining whether Selby is disabled. *See Beckley, supra*; *Banks, supra*.

Selby argues the ALJ erred in rejecting her subjective complaints without making a complete analysis under *Polaski*. She further argues the ALJ erred in posing an inaccurate hypothetical question to the VE. The Commissioner argues the ALJ was not required to discuss each of the factors cited in *Polaski*. He claims the ALJ properly

recognized the *Polaski* framework, and discussed the inconsistencies in the record upon which he based his credibility determination. The Commissioner further argues the ALJ included in his hypothetical question to the VE all of Selby's impairments and restrictions the ALJ found to be credible.

The court finds the ALJ performed a proper credibility analysis even though he did not specifically discuss each *Polaski* factor separately. He found Selby's subjective complaints to be credible to the extent that her "medically determinable impairments could reasonably be expected to produce the alleged symptoms." (R. 21) However, he further found Selby's "statements concerning the intensity, duration and limiting effect of these symptoms" not to be entirely credible. (*Id.*) The ALJ cited inconsistencies in the record that led him to this conclusion. Among other things, Selby reported that she was able to do some house cleaning, cook, do laundry, drive, go shopping, and do some strength exercises. She consistently reported to her doctors that various combinations of medications and treatment modalities provided her some pain relief. Although she continued to have pain, she never suggested her pain was intolerable, and she stated more than once that she had "learned to live with it." In addition, she declined treatment options that had provided her relief in the past.

Furthermore, although Selby's back injury occurred in 1999, she continued to work despite her ongoing problems with pain and physical limitations. She did not stop working until her husband's death in July 2003, when she decided to move back to Iowa. As the Commissioner notes in his brief, nothing in the record indicates Selby experienced an increase in her pain level or other symptoms to support her allegation that she became disabled as of August 25, 2003. Her symptoms appear to have continued without significant change ever since her injury in 1999. The fact that Selby continued to work for several years after her injury, with no significant deterioration in her condition, "demonstrate[s] the impairments are not disabling in the present." *Goff v. Barnhart*, 421

F.3d 785, 793 (8th Cir. 2005) (citing *Orrick v. Sullivan*, 966 F.2d 368, 370 (8th Cir. 1992)).

The court also finds the record contains substantial evidence to support the ALJ's rejection of Selby's claim that she is completely unable to concentrate due to pain and the effects of her medications. As the state consultant Dr. Wright noted, Selby takes numerous medications and remembers to take them timely without assistance from anyone. Dr. Rogers, who credited Selby's efforts to suppress her discomfort, found Selby to have good attention and concentration, with good retention of both recent and remote information. Although Dr. Rogers indicated Selby's "depression" likely would affect her attention and concentration after an extended effort, and also likely would reduce her ability to interact appropriately with others from time to time, there is no evidence in the record that Selby ever been diagnosed with depression, or that he has sought any form of treatment for depression or other mental problems.

Considering the record as a whole, the court finds Selby's impairments, "objectively considered, [are] not obviously so serious as to lend credence to [her] subjective complaints." *Benskin v. Bowen*, 830 F.2d 878, 882-83 (8th Cir. 1987). The issue is not whether Selby is in pain; the record clearly establishes that she suffers pain. The issue "is whether she is fully credible when she claims that her back hurts so much that it prevents her from engaging in her prior work. These statements are consistent only with the fact of pain, not with any particular level of pain." *Id.*, 830 F.2d at 883. As was the case in *Benskin*, substantial evidence in the record in the present case is inconsistent with the claimant's allegation of constant, *disabling* pain. *See id.*, 830 F.2d at 885. *See also Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) ("The mere fact that working may cause pain or discomfort does not mandate a finding of disability[.]") (citing *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996)).

Because the ALJ's hypothetical question to the VE contained those impairments he found to be credible, the hypothetical question was proper. *See Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) ("A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.' *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)."). The VE's response to the properly-formulated hypothetical question constitutes substantial evidence on the record that Selby is able to return to her past work as a nurse's aide, as Selby performed that job. *See Pierce v. Apfel*, 173 F.3d 704, 707 (8th Cir. 1999) ("Testimony from a VE based on a properly-phrased hypothetical question constitutes substantial evidence.' *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996).").

The court finds the record, as a whole, contains substantial evidence to support the ALJ's decision that Selby is not disabled.[6]

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[7] to the Report and Recommendation in accordance with

---

[6]The facts in this case and the conclusions they mandate are unfortunate. In *Nettles v. Sullivan*, 956 F.2d 820 (8th Cir. 1992), the Eighth Circuit Court of Appeals noted:

> We express some sympathy for the claimant despite our ruling in this case. Although the claimant may suffer serious back pain and cannot work without discomfort, she has continued to work despite her alleged pain. We recognize that if the claimant had decided not to work, she might have qualified for disability benefits because she may have been able to prove that she was incapable of engaging in substantial gainful activity for a least twelve months.

*Id.*, 956 F.2d at 823. A similar situation exists in the present case. It may be only coincidence that Selby ultimately stopped working only after her husband died. On this record, however, there simply is no evidence that her condition worsened significantly at that time, suddenly rendering her disabled when she had been able to continue working, despite discomfort, since her 1999 injury.

[7]Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.

28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be affirmed.

**IT IS SO ORDERED.**

**DATED** this 10th day of January, 2008.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT