**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

PAMELA S. SELBY,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

No. C 06-3057-MWB

**ORDER REGARDING
MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION AND
PLAINTIFF'S OBJECTIONS**

———————————

**TABLE OF CONTENTS**

*I.  INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II.  FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.  LEGAL STANDARDS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    *A.  For Reviewing A Magistrate Judge's Report And Recommendation* . . . . 7
    *B.  For Reviewing The Commissioner's Final Decision* . . . . . . . . . . . . . 11

*IV.  LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    *A.  Un-Objected-To Finding* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    *B.  Objected-To Findings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        *1.  Credibility Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        *2.  Work history after her injury* . . . . . . . . . . . . . . . . . . . . . 18
        *3.  Mental ability* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        *4.  Reliance on Dr. Kim's report* . . . . . . . . . . . . . . . . . . . . 19
        *5.  Medical vocational guidelines* . . . . . . . . . . . . . . . . . . . . 23

*V.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## I.  INTRODUCTION

Plaintiff Pamela Selby applied for Title II disability insurance (DI) benefits and disabled widow's insurance (DWI) benefits on September 4, 2003.  Selby also applied for Title XVI supplemental security income (SSI) benefits on October 20, 2004.  Selby alleged she became disabled on August 25, 2003, due to two ruptured discs in her back.  The Commissioner denied her applications initially and on review.  Following a hearing, an administrative law judge (ALJ) determined Selby was not disabled.  The ALJ's decision became the final decision of the Commissioner after the Social Security Administration (SSA) denied Selby's request for review.

Selby appealed the administrative decision to this court, and the matter was referred to Chief Magistrate Judge Paul Zoss for a report and recommendation.  Judge Zoss respectfully recommended the Commissioner's decision be affirmed.  Dkt. # 18.  Selby timely filed specific objections to Judge Zoss's report and recommendation.  Dkt. # 19.  The Commissioner did not object to Judge Zoss's report and recommendation, but did file a response to Selby's objections.  Dkt. # 20.

## II.  FACTUAL BACKGROUND

The relevant factual background has been repeatedly stated in the parties' briefs and most comprehensively accounted for in Judge Zoss's report and recommendation.  As a result, the court will only attempt to briefly recount the factual background here.  Any remaining relevant factual background, including any specific factual findings Selby disputes in her objections, will be discussed in the court's legal analysis.

Selby was born in 1952.  She initially hurt her back on April 21, 1999, while working as a housekeeper at a nursing home in Wichita, Kansas.  Selby took six weeks off

work because of her injury. When she returned, she assumed less demanding work as a nurse's aid. She basically assisted the nurses with clerical tasks and charting. Her work gradually changed, however, into more physically demanding activity that she was unable to perform. As a result, she left the job in January of 2000. She stayed unemployed for two years because she "did not know for sure what kind of job [she] could get." R. 340.

In January of 2002, Selby began work at a residential facility for mentally challenged individuals called New Hope. She initially provided residents with medication and helped them with their personal care in the morning. When the work became too much for her, her employer offered to move her to the less physically demanding night shift. Selby declined because she had a minor daughter at home.

Selby had an MRI done in November of 2002. The MRI showed "degenerative disc changes rather advanced L4-5 with broad based disc bulge." R. 154. In December of 2002, Dr. Philip Mills reviewed the MRI results with Selby and referred her to Dr. Jon Parks for an epidural injection at the pain clinic. Dr. Jon Parks administered the epidural steroid injection days later, which provided "very gratifying results" for about a week. R.152. Dr. Parks gave Selby another injection in late January of 2003, and assessed Selby with "L4-5 disc desiccation and disc bulge, particularly left lower extremity, L4-5 and L5-S1 radicular-type symptoms," "L5-S1 disc bulge centrally," and a "[h]istory of chronic myofascial pain syndrome of the lumbar spine, stable." R. 152. Selby returned for a follow-up in April of 2003 and reported that her pain had improved since the injection. Selby then returned to see Dr. Mills on July 15, 2003, and indicated to him that she was doing "reasonably well" with injections every three months.

Selby's husband died on July 18, 2003. As a result of her husband's death, Selby took a month off work at New Hope, and her return to work was unsuccessful. She quit her job in the summer of 2003, and because of her husband's death, she received Title 19

assistance on behalf of her minor daughter. R. 340. That was the last time Selby worked full-time.

Selby received temporary work restrictions from Ruth Sherman, D.O., on August 18, 2003. A day later, Dr. Mills imposed permanent work restrictions that included no bending or stooping, no lifting or carrying over thirty-five pounds, and only "lift[ing] with proper body mechanics." R. 157-58. Dr. Mills imposed the restrictions due to Selby's "chronic low back pain." R. 157.

Selby thereafter moved to Iowa. She also applied for DI and DWI benefits at this time, specifically on September 4, 2003. As a result, Dr. Y. Kim reviewed Selby's medical records and wrote a physical residual functional capacity (RFC) assessment in October of 2003. Upon his review of her records, Dr. Kim opined that Selby would be able to lift up to twenty pounds occasionally and ten pounds frequently; stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday; sit with normal breaks for a total of about six hours in an eight-hour workday; and push and/or pull according to her lifting and carrying limitations. R. 202. Dr. Kim noted Selby indicated her pain was a seven on a ten scale, but that her allegations are only "partially credible because they are not supported by the wide-range of daily activities" she performs. R. 206. Dr. Kim reported those daily activities as cooking and laundering without any help, performing household chores, shopping for groceries, driving her car, and leaving the house without assistance. R. 206. Selby continued to see doctors in Iowa for her lower back problems. On November 18, 2003, Selby saw Dr. Michael Stitt. Dr. Stitt did not "examine [her] much," but ordered physical therapy and requested the MRI results and records from her previous doctors. R. 165. Selby went to physical therapy three times, and found the 45 minute drive to therapy overly burdensome and the sessions unhelpful. Selby was encouraged to find therapy closer to home, and she was advised that her chronic

pain would not improve with only a few treatments. She was discharged from physical therapy "per her choice." R. 166.

At the request of Disability Determination Services, Dr. Dan Rogers performed a mental status examination interview with Selby, and reviewed her medical records, on December 15, 2003. Dr. Rogers noted Selby "was in obvious pain but did not appear to be dramatic in her reactions to pain, but instead seemed to be suppressing her discomfort." R. 179. Dr. Rogers also noted Selby was "depressed, but this appears to be a reaction to the loss of her husband, the problems faced by two of her children, and the chronic pain that she experiences." R. 180. On February 1, 2004, Dr. Dee Wright reviewed Selby's records and completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form. Dr. Wright noted that Selby "is able to perform a range of cognitive activity from simple to moderately complex without significant limitations of function," and also that "[t]he evidence in the file does not indicate the claimant is currently manifesting severe limitations of function with social interaction or activities of daily living from a psychological perspective." R. 199.

On February 6, 2004, Dr. Claude Koons reviewed Selby's previous physical RFC assessment written by Dr. Y. Kim. Dr. Koons affirmed Dr. Kim's RFC assessment. R. 208.

Also in early 2004, Selby began seeing Dr. Marco Araujo for pain management. On January 15, 2004, Selby reported her pain was eight out of ten to Dr. Araujo. R. 276. Dr. Araujo prescribed medication management for her pain at the time. On February 11, 2004, Selby reported her pain as a seven out of ten to Dr. Araujo. R. 269. Then on May 17, 2004, Selby returned to Dr. Araujo and reported her pain to be nine out of ten. R. 262. At that time, Dr. Araujo administered a right trochanteric bursal injection. R. 267. Selby returned to Dr. Araujo on June 10, 2004, and reported her pain as a seven out of

ten. R. 256. As a result of the injection, "[s]he improved some of her symptoms." R. 256. On August 5, 2004, Selby followed up with Dr. Araujo again and reported her pain as a nine out of ten. R. 251. On September 1, 2004, Dr. Araujo performed a nerve block on Selby. Two weeks later Selby reported that her pain was about 75% better for four hours after the procedure. Dr. Araujo noted that he thought Selby had "a good chance of having more long-term pain relief." R. 233. At the time, Selby reported her pain as an eight out of ten, and that "she has pain of 5/10 after she takes her medications and 4/10 at its best." R. 234. Selby saw Dr. Araujo again on October 14, 2004, and underwent another procedure to relieve her pain. After her procedure, she followed up with Dr. Araujo on November 16, 2004, and reported "great improvement in her back discomfort and [that she] is doing better at this point." R. 216. She reported her pain to be a seven out of ten. Selby followed up with Dr. Araujo again on December 22, 2004, and reported her pain to be "rated at 2/10." R. 211. Selby saw Dr. Araujo for the last time on March 25, 2005. She still reported improved back pain, but had right-sided hip and thigh discomfort. She said her pain was a seven out of ten. R. 296. Dr. Araujo noted that Selby had been more active since her last visit because she was babysitting and taking some classes.

In December of 2004, Selby began a part-time job at a daycare. She worked two to three days a week and, at the most, worked twenty-four hours a week. R. 339. At the daycare, she would try not to lift anymore than she had to. She received a lot of assistance from her coworkers, but sometimes had to lift a gallon of milk in each hand. R. 341. Selby was still working at this job by the time of her initial hearing in August of 2005.

On July 18, 2005, Selby saw physical therapist Daryl Short for a physical functional assessment. Based on Short's assessment, Selby's pain was constant, but "[s]he could carry 5-10 lbs. occasional[ly] throughout a working day and function." R. 301. At the end of

July, 2005, Selby's attorney requested Dr. Stitt perform a Physical RFC questionnaire. The questionnaire requested Dr. Stitt to answer several questions about Selby's physical RFC, and to also include any relevant test results with his answers. Dr. Stitt's answers provided a dim picture of Selby's physical health, and he noted that Selby needed a job which permitted shifting positions at will from sitting, standing, and walking. R. 307. Dr. Stitt did not attach any test results, and the record only reveals that he treated Selby on one occasion—in November of 2003.[1] R. 165.

On August 11, 2005, Selby went back to the pain clinic where Dr. Araujo worked, but this time saw Dr. Mohammed Youssef. She reported that her pain averaged about six out of ten, and that after her last invasive pain treatment procedure she received a "50% decrease in her pain that lasted for 2 months," but that "[c]urrently [she] is not interested in any invasive pain management procedures." R. 311.

## III. LEGAL STANDARDS

### A. For Reviewing A Magistrate Judge's Report And Recommendation

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

---

[1] Judge Zoss determined that Dr. Stitt's answers were of little or no value because they were not accompanied by any records or evidence to provide a context for the basis of his opinions. Dkt. # 18.

7

28 U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. Iᴀ. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation).  While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask.  Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985).  Thus, a district court *may* review de novo any issue in a magistrate judge's report and recommendation at any time.  *Id.*  If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate."  *Thomas*, 474 U.S. at 150.

De novo review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter.  *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting de novo review is "distinct from any form of deferential review").  The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been

made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while de novo review generally entails review of an entire matter, in the context of § 636 a district court's *required* de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)). Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general pro se objections to require a de novo review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, this court will strive to provide de novo review of all issues

that might be addressed by any objection, whether general or specific, but will not feel compelled to give de novo review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed). The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a

definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

### B. For Reviewing The Commissioner's Final Decision

Of course, the court must also keep in mind the standards for reviewing the Commissioner's final decision and the applicable standards for making a disability determination. These standards were detailed in Judge Zoss's report and recommendation, so the court will only briefly summarize them here. Dkt. # 17.

A disability determination must be made using the five-step sequential process outlined in the federal regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*,

500 F.3d 705, 707 (8th Cir. 2007) ("The Commissioner uses a five-step evaluation to determine if a claimant is disabled."). First, the Commissioner considers the claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, then the Commissioner determines if the claimant has a "severe medically determinable physical or mental impairment" under the second step. *Id.* § 416.920(a)(4)(ii). If not, then the claimant is not disabled. If so, then the Commissioner goes on to the third step to determine if the severe impairment "meets or equals" a listed impairment. *Id.* § 416.920(a)(4)(iii). The claimant is disabled if the impairment is listed, but, if not, the Commissioner must assess the claimant's "residual functional capacity and [his or her] past relevant work" under the fourth step. *Id.* § 416.920(a)(4)(iv). If the claimant can still perform past relevant work, the claimant is not disabled. However, if the claimant cannot perform past relevant work, then at the fifth and final step the Commissioner determines if the claimant "can make an adjustment to other work." *Id.* § 416.920(a)(4)(v). The claimant is not disabled if he or she can adjust to other work.

If appealed, the court reviews the Commissioner's decision to determine whether the correct legal standards were applied and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). Under this deferential standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). Even if the court would have "'weighed the evidence differently,'" the Commissioner's decision will not be disturbed unless "it falls outside the available 'zone of choice.'" *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)).

## IV.  LEGAL ANALYSIS

The ALJ determined Selby was not disabled because she failed to meet the requirements under step four in the five-step sequential analysis.  R. 21.  In other words, the ALJ found (1) Selby was not engaged in substantial gainful activity, (2) Selby has a severe medically determinable physical or mental impairment, (3) Selby did not meet any Listing for a presumptive disability, and (4) Selby's residual functional capacity allowed her to perform her past relevant work.  Because of his finding at the fourth step, the ALJ did not need to determine (5) whether a person with Selby's RFC could perform other work in the national economy.  Judge Zoss issued a report and recommendation that found substantial evidence supported the ALJ's decision.  Thus, the court's duty is to review the ALJ's decision, with the aid of Judge Zoss's report and recommendation, to determine whether substantial evidence supports the ALJ's decision through step four.

### A.  Un-Objected-To Finding

Judge Zoss made several findings in his report and recommendation.  Selby objects to basically all of those findings except one:  Selby does not object to Judge Zoss's recommendation that Selby's spinal disorder fails to meet the requirements of Listing § 1.04(A) for a presumptive impairment under step three.  Selby originally argued in her brief that she met the requirements for Listing § 1.04(A), and therefore she should be found disabled at step three in the five-step sequential process.  But because she has not objected to Judge Zoss's report and recommendation on this point, the court will review Judge Zoss's recommendation for clear error.  *See Raddatz*, 447 U.S. at 675 (noting a district court "'would have to give fresh consideration to those issues to which specific objection has been made'" (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976

U.S.C.C.A.N. 6162, 6163)); *Grinder*, 73 F.3d at 795 (noting a clear error review is appropriate when no objections are filed).

The court is not left with "a definite and firm conviction" that Judge Zoss made a mistake regarding his un-objected-to recommendation that Selby did not meet Listing § 1.04(A). *U.S. Gypsum Co.*, 333 U.S. at 395. Listing § 1.04(A) requires "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). Selby's lower back is definitely involved in her disability claims and, therefore, positive straight-leg raising tests are required for her to meet the presumptive disability as listed under § 1.04(A). The record shows Selby's straight-leg tests were negative. R. 151, 162, 262, 269, 276, 311. Thus, even though the Commissioner concedes there may be evidence of nerve root compression in this case, there is no evidence of positive straight-leg raising tests. As a result, the court accepts Judge Zoss's report and recommendation on this point. Selby is not entitled to a presumptive disability under Listing § 1.04(A).

### B. Objected-To Findings

Selby makes five objections to Judge Zoss's report and recommendation. Dkt. # 19. The first four of these objections relate to the ALJ's decision at step four, and Judge Zoss's recommendation that substantial evidence supports the ALJ's decision at step four. In other words, in her first four objections, Selby basically argues the ALJ's assessment of Selby's RFC, and the ALJ's corresponding determination that Selby could perform her

past relevant work with such an RFC, is not supported by substantial evidence. Based on the evidence the ALJ found to be credible, the ALJ assessed Selby's RFC as the ability

> to work performing more than simple, constant tasks but not complex tasks with occasional production pace defined as strict quotas or timeframes; lifting 20 pounds occasionally and 10 pounds frequently; standing and/or sitting for a total of 6 hours in an 8-hour workday and performing postural maneuvers including balancing, stooping, kneeling, crouching, crawling and climbing stairs only occasionally but never climbing ladders.

R. 19. With this RFC, the ALJ determined Selby could perform her past relevant work as a nurse aid. R. 21. Selby's first four objections dispute this determination, and are discussed below.

### 1. Credibility Analysis

In her first objection, Selby argues the ALJ failed to conduct a proper credibility analysis under *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). The ALJ determined that Selby's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [Selby's] statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible." R. 21. In making his credibility determination, the ALJ properly recognized that he could not "disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1322. The ALJ further noted the oft repeated and always important *Polaski* language:

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;
2. the duration, frequency and intensity of the pain;
3. precipitating and aggravating factors;
4. dosage, effectiveness and side effects of medication;
5. functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Id.* The ALJ further recognized two other factors that are to be considered when making credibility determinations under Social Security Ruling 96-7p:

[6.] Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
[7.] Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board)[.]

Social Security Ruling 96-7p. Although the ALJ recognized these seven factors, he did not discuss all of them in his ruling. However, as argued by the Commissioner and noted by Judge Zoss, an "ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered." *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

Selby still argues the ALJ made an improper credibility analysis because the ALJ should not have relied on the alleged inconsistencies cited by the state agency physicians, Drs. Kim and Koon. The ALJ, however, did not "rely" on Drs. Kim and Koons's report that Selby's allegations of pain were only partially credible. Instead, the ALJ "considered the inconsistencies cited" by Drs. Kim and Koons and "concur[red] with th[o]se findings." R. 21. In concurring with those findings, the ALJ considered evidence in the record

concerning the first, fourth, and sixth factors noted above.  Regarding the first factor, the ALJ stated Selby "does some house cleaning, drives when necessary, does some shopping and does some strength exercises (exhibits 3E/4, 4E/3).  Claimant also does cooking, laundry and some housekeeping chores (exhibit 4E/2)."  R. 21.  Regarding the fourth and sixth factors, the ALJ noted "[m]edication helped reduce [Selby's] pain," and that Selby had received "significant relief from injection therapy."  R. 21.  The ALJ also noted that although the observations of third parties supported Selby's subjective allegations of pain, those observations were not medically informed, disinterested, or "consistent with the preponderance of the opinions and observations by medical doctors in this case."  R. 21.

In the court's de novo review of this issue, the court does find evidence that Selby could "care for her personal needs such as bathing, grooming, dressing, etc.," and that she cooked and did laundry without any help, and that she did some housekeeping chores like vacuuming and cleaning the bathroom.  R. 107.  She also shopped for groceries and could drive.  R. 108.  It is clear, too, that medication helped Selby deal with her pain to a degree, and that other non-medicinal pain management techniques provided her with great relief.  R. 233, 234, 256, 268, 274.

It is also apparent that the witnesses that testified on Selby's behalf were not disinterested and not medically trained.  R. 353-56.  The first witness, a co-worker named Charlene Bergren and Selby's sister-in-law, stated Selby could not comprehend math or reading, and as a result, Bergren had to fill out all of Selby's disability applications.  Bergren stated Selby's comprehension was poor because her pain interfered with her concentration.  The second witness, another co-worker named Karen Terry, provided financial assistance to Selby.  Selby and Terry also lived together, and Selby helped out with groceries through food stamps.  Terry stated Selby could not do any lifting or vacuuming "[b]ecause of her back and her pain."  R. 355.  Terry also stated that Selby had

to take breaks at work and that Selby's pain is real. Although there is evidence that Selby has poor concentration and minimal education, R. 90,179-80, the record does not fully support Bergren's assertion that Selby needed help completing the disability forms because, as the Commissioner argues, it was not indicated on Selby's "Activities of Daily Living" or "Daily Activities Questionnaire" forms that Selby had any help completing the forms. R. 112, 128. The record also somewhat discredits Terry's assertion that Selby could not do any vacuuming because Selby indicated that she at least "rarely" vacuumed after she moved to Iowa. R. 125, 107. As a result, there is evidence to support the reasons why the ALJ discredited the subjective evidence. Selby's first objection is overruled.

### 2. *Work history after her injury*

In her second objection, Selby argues Judge Zoss's report and recommendation improperly assessed the ALJ's credibility determination because Judge Zoss did not properly state Selby's work history after her injury. Selby argues her injury occurred at work and, thereafter, she only returned to work for a limited time and with significant alterations to her duties. The court recognizes the truth to Selby's objection in that when she returned to work after her injury she did not perform the same duties as she had done before. Moreover, she did not work continuously, as she was unemployed from January 2000 to January 2002. Nevertheless, Selby did engage in substantial gainful activity after her injury, and the record does not indicate Selby's condition significantly deteriorated after she finally quit working in her light duty positions when she moved to Iowa. As a result, the court agrees with Judge Zoss that her "prior work record," *Polaski*, 739 F.2d at 1322, tends to "demonstrate[] the impairments are not disabling in the present," *Goff v. Barnhart*, 421 F.3d 785, 792-93 (8th Cir. 2005), and that there is evidence to support the ALJ's credibility determination that Selby's allegations of pain are not as intense, long-lasting, and limiting as she indicates. Selby's second objection is overruled.

### 3.     *Mental ability*

In her third objection, Selby objects to Judge Zoss's characterization of Selby's mental abilities.  Judge Zoss stated there is no evidence that Selby was diagnosed with depression or that she has sought any form of treatment for any mental health problem.  Selby objects to this statement, but not because it is incorrect.  Selby, in fact, never was diagnosed with depression or sought treatment for mental health problems.  Instead, Selby objects because she did have a medically determinable mental impairment that limited her cognitive functioning.  Selby is correct that Dr. Wright concluded the evidence in the file indicated she had "a medically determinable mental impairment—an adjustment reaction with depressed mood," R. 199, and that Dr. Rogers noted Selby was depressed, R. 180.  However, the evidence in the record that Selby's pain limited her cognitive functioning does not support a claim that Selby was unable to concentrate and was disabled as a result.  In fact, Drs. Rogers and Wright specifically noted that "[h]er attention and concentration are good for relatively brief periods," and that she only had "moderate cognitive restrictions of function."  R. 180, 199.  There is evidence to support the ALJ's determination that Selby's allegations of pain are not as cognitively limiting as she alleged.  Selby's third objection is overruled.

### 4.     *Reliance on Dr. Kim's report*

Selby's fourth objection argues the ALJ's first hypothetical question was improper because the hypothetical question was based "on the limitations and restrictions set forth in Dr. Kim's report that was reviewed by Dr. Koons." Dkt. # 19.  Selby argues Dr. Kim's report is not substantial evidence because Dr. Kim never saw, met, treated, or examined Selby.  Moreover, Selby argues Dr. Koons specializes in gynecology and simply rubber-stamped Dr. Kim's report.  Instead of this medical evidence, Selby argues the ALJ should have relied on the reports of Dr. Stitt and physical therapist Short.

Federal regulations require an ALJ to "evaluate every medical opinion," but that more weight should be given "to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)." 20 C.F.R. § 404.1527(d). In addition, if a "treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," that opinion is entitled to "controlling weight." *Id.* § 1927(d)(2). Case law makes it clear that "[a] treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight," *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000), and that "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence," *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).

In the court's de novo review of this issue, the court does not believe the reports from Dr. Stitt or therapist Short are entitled to controlling weight. First, Dr. Stitt's opinion does not provide "a detailed, longitudinal picture" of Selby's impairments. 20 C.F.R. § 1927(d)(2). Dr. Stitt, in fact, only saw Selby on one occasion, and on that occasion he did not "examine [her] much." R. 165. Thus, Dr. Stitt is not really a "treating source" who's opinion is entitled to substantial weight. Moreover, Dr. Stitt's opinion is inconsistent with other evidence, namely Dr. Kim's report. Furthermore, as Judge Zoss noted, Dr. Stitt's answers to the questionnaire came eighteen months after he examined Selby, and there are no treating records attached to his answers to form the basis for his opinions. For similar reasons, physical therapist Short is not a treating source. While Short may have provided physical therapy to Selby on more than one occasion, the only evidence in the record from Short is his physical functional assessment. R. 303.

Notably, both Dr. Stitt's answers to the physical RFC questionnaire and Short's letter concerning Selby's physical functional assessment were written at the request of Selby's attorney.

Of course, Dr. Kim is not a treating source either. Dr. Kim never examined Selby; he only reviewed the evidence in her file. Dr. Koons only reviewed Dr. Kim's report. In fact, the court finds only one medical source that is "able to provide a detailed, longitudinal picture of [Selby's] medical impairments" after her alleged onset date of disability. 20 C.F.R. § 1527(d)(2). That source is Dr. Araujo and the pain management team at his clinic. Dr. Araujo is the only medical doctor that treated Selby more than once after her move to Iowa. Selby saw Dr. Araujo in 2004 on the following dates: January 15, February 11, May 17, June 10, August 5, September 1, September 15, October 14, November 16, and December 22. Selby also saw Dr. Araujo on March 25, 2005, and Selby finally saw Dr. Youssef—who worked with Dr. Araujo—on August 11, 2005. On her first visit on January 15, 2004, Dr. Araujo noted that Selby wished "to transfer all her care to our pain management center." R. 275. On her last recorded visit to the pain clinic on August 11, 2005, Dr. Youssef noted "Selby is a well known patient to the pain management team." R. 310. Thus, most of Selby's medical care after her alleged onset date of injury came from the pain clinic with Dr. Araujo and, as a result, Drs. Araujo and Youssef's opinions are entitled to considerable weight.

Unfortunately, however, the reports from Drs. Araujo and Youssef do not lend themselves well to the task of determining Selby's RFC. Their reports mostly indicate what level of pain Selby reported she was experiencing and how they were treating it. R. 211-13, 216-17, 221-22, 233-35, 239, 251-52, 256-57. The reports do not indicate physical RFC measurements such as how much weight Selby could lift, or how long she could stand, walk, or sit. The reports do, however, indicate that Selby "just lived with"

her pain, R. 274, and that Dr. Araujo believed Selby had "a good chance of having more long-term pain relief," R. 233. Dr. Araujo's reports also reveal that Selby received significant pain-relief by taking her medication and undergoing various treatments. R. 216, 233, 256.

In addition, the reports from Drs. Araujo and Youssef offer guidance as to whether the ALJ should have followed Dr. Kim and Koons's reports or the reports from Dr. Stitt and Short. The numerous reports from Drs. Araujo and Youssef are somewhat inconsistent with the reports from Dr. Stitt and Short. Whereas Dr. Stitt and Short stated Selby could only sit for five to ten minutes at a time, R. 303, 307, Dr. Youssef noted that Selby's "pain is increased by bending forward, walking or sitting *for a long time*," R. 310 (emphasis added), and that during her several visits with Drs. Araujo or Youssef, Selby was able to provide her history in a "sitting-up" position, R. 234, 251, 310. Also, whereas Dr. Stitt and Short opined that Selby could only stand for fifteen minutes at a time, and tended to shift from one leg to another, R. 303, 307, Dr. Araujo noted Selby was "able to stand up without any complications," R. 257, and could provide her history from a "standing-up position," R. 269. Furthermore, on two occasions, Dr. Araujo noted Selby did not appear to have any "acute distress," or "acute pain distress." R. 211, 216.

In this case, the court cannot say the ALJ erred in relying on the reports of Drs. Kim and Koons to determine Selby's RFC and to form the first hypothetical question to the vocational expert (VE). The report from Drs. Kim and Koons is not ideal because neither doctor examined or treated Selby. Nevertheless, the reports from Dr. Stitt and Short have similar deficiencies because their responses to the requests from Selby's attorney are not supported by documentation. Just as Dr. Koons relies on Dr. Kim's report, so, too, does Dr. Stitt apparently rely on Short's physical functional assessment. While Short and Dr. Stitt at least saw Selby, the court does not believe their reports should

be given greater weight than Dr. Kim's report because the reports from Dr. Stitt and Short are somewhat inconsistent with the reports from Drs. Araujo and Youssef. Moreover, the ALJ's credibility analysis and reliance on Dr. Kim's report is not inconsistent with the reports from Drs. Araujo and Youssef. Dr. Kim's report, affirmed by Dr. Koons, offers substantial support for the ALJ's RFC assessment and reliance on the first hypothetical question. *Gulliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) ("A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" (quoting *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)). Therefore, as Judge Zoss recommended, the ALJ's reliance on the VE's answer to that question constitutes substantial evidence in support of the ALJ's decision. *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) ("Testimony from a VE based on a properly-phrased hypothetical question constitutes substantial evidence."). Selby's fourth objection is overruled.

### 5. *Medical vocational guidelines*

Selby's final objection argues that the ALJ should have found her disabled under the medical vocational guidelines (grids). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2. Judge Zoss recommended that the grids could not be used because Selby's ability to function is largely limited by nonexertional impairments, or pain, and in such a case "the ALJ cannot rely exclusively on the grids to determine disability." *Beckley v. Apfel*, 152 F.3d 1056, 10569 (8th Cir. 1998). Selby argues otherwise, stating pain is a proper consideration in applying the grids.

The court need not answer Selby's objection directly because "the ALJ clearly determined that [Selby] was not disabled at step four, and the [grids] are applied only at step five. Because he determined that [Selby] was not disabled at step four, the ALJ did not need to reach step five. Consequently, the deficiency does not require reversal since

it had no bearing on the outcome." *Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008) (internal citation omitted). Likewise, because the court has found substantial evidence supports the ALJ's decision at step four, any deficiency at step five has no bearing on this case. Selby's fifth objection is overruled.

## V. CONCLUSION

Selby's objections are all overruled. The court reiterates the sympathy Judge Zoss noted for Selby's situation. *See* Dkt. # 18 n.6. Although the court may have weighed the evidence differently, the court's only job on appeal is to determine whether the ALJ's decision falls within the "available 'zone of choice.'" *Nicola*, 480 F.3d at 886 (quoting *Hacker*, 459 F.3d at 936). The ALJ's decision falls within that zone in this case. Judge Zoss's report and recommendation is **accepted**, and the Commissioner's decision is **affirmed**.

**IT IS SO ORDERED.**

**DATED** this 20th day of March, 2008.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA